[ Woodworth, J.
It is, notwithstanding, an authority here by which we are bound.]
Spencer. A writ of error is brought in that cause.
[ Woodworth, J.
That makes no difference. The decision is in point *, and, till reversed, we must abide by it.]

[Sutherland, J.

There is but one way of questioning our opinions upon a point directly involved in the cause decided. That is by bringing a writ of error. If we sit to hear them questioned in this Court, there is nothing settled by any decision which we can make. On a point incidentally decided, it might be different.]
*737 Spencer. It was necessary to raise the point here in order to avail ourselves of.it upon error, should the Court be against us. ■ . '

[Savage, Ch. J.

You are undoubtedly right in raising the question, but a majority of the Court are decidedly against hearing it argued.]
Spencer proceeded to the 5th point.
5. This relates to the question of intention, and the force of usage. If one, on loaning money, take more than 7 per cent, at the time of the loan, the law will fix the intent. The bank clerk says, that Hunt, the cashier, ordered him to discontinue the calendar year, and calculate by the rule adopted in relation to these notes; and that he had done so ever since he came into the institution. Was either the cashier or the clerk ignorant of the consequences which would follow ? The almanac is a part of the law of the land,(u) and every one will be presumed to understand it. If the conventional standard take more than 7 per cent, the law will imply intention and corruption. A loan is for a year’s per cent, or more, or less. The parts of a year are in question. The statute does not mention months, or any term short of a year. It speaks of a loan for a year, or, a longer or shorter time, The necessity of resorting to months, upon principles of convenience is denied. The legislature knew that interest could be computed by years and days with perfect ease. Why then resort to months 1 The answer given by the plaintiffs is, that they have been guilty of taking, interest in this manner for more than 10 years, and that their neighbors are as guilty as they are.
In Marsh v. Martindale, Ld. Alvanley, Ch. J. gave his opinion, in terms, “ that if a man agree to take more than 5 per cent, for the forbearance of money, the law declares that such an agreement is corrupt, within the statute of Anne, whether the party thought, at the time, that he was acting contrary to the statute or not.” That case was a bill of exchange for £5000, for which a bond was substituted, payable at 3 years, and £750, the precise legal interest, was *738 taken in advance. All the points decided were material to the present case. The first was, that taking interest in advance is usury: 2. That taking more than legal interest on a loan, in any case, is usury: and 3. That this is a question of law. “ And though (says the Ch. Justice) the jury have found that Sir Charles Marsh did not think that he was acting contrary to law, there is nothing in that finding to prevent us from examining the transaction, and declaring it to be corrupt, if it appear to us to be so in point of law without sending the case back to a jury to find the corruption.”
The custom relied on must be very limited. The Court will see, by an examination of our bank charters, that they are rarely authorized to take more than 6 per cent, interest. This usage could not have existed any where in the state, till this bank was chartered, 13 or 14 years ago. The usage of shortening months, &c., must have been confined, before this to discounts at 6 per cent, which would not have reached the sum allowed by the statute of usury. There is, then, no usage to influence the case.
But if there were usage, I deny its force when set up to control the statute of usury. I do this on the authority of Dunham v. Gould,(v) decided by the Court of Errors, in which the late Chancellor examines all the cases upon this point, and shows that they rest upon distinct principles. Suppose a loan of $1000, at 3 years; and 3 separate notes, at 3 years, given simultaneously for the interest, these three notes also drawing interest. This transaction is reached, exactly, upon banking principles. Such was the case of the Bank of Maine v. Butts.(w) $10,000 were loaned—4000 for 2 years, and. 6000 for 3 years—and small notes, dated at the same time, and payable at 3 years, were taken on interest to secure each accruing years’ interest upon the large notes. This was holden usurious : and the Court adopt the sensible distinction between a mere miscalculation, and an intention to compute by a usurious rule. Have the plaintiffs shown any mistake in their arithmetical calculations ? No. They understand themselves perfectly. They are right throughout, in fractions of years, months, &c., and the result is cor. rect. I hope the Court will keep in view the difference be *739 tween a mere mistake of a figure, a miscalculation, and the voluntary application of a mistaken rule. In the latter case it is usury. It cannot be excused by the force of usage, or any other pretence. Suppose the merchants of a city should all lighten their weights, and contract their yards, could they shelter themselves under this usage, of their own creation, from the penalties inflicted for selling by false weights and measures 1
The agreement may be perfectly pure ; yet if more be taken than 7 per cent, as a premium for the loan, by force of any pretended rule or custom, it is void.(x)
If the bank retained more than 7 per cent, knowingly, it was usury, though Wager did not know it. It is enough that the party who makes the loan understands the subject. The authority to the agent was, to pay what was demanded upon the third note. This was done. The bank demanded $18 09, and it was paid accordingly. The agent meets the proposition made by the bank. Usury never could be reached, if the counsel are allowed to refine away this case by saying that the bank acted without an usurious intent. It might as well be said they could have no criminal intention, because (being a corporation) they had no soul.

E. Griffin,

(same side.) It will be recollected, that the sum of $18 09, was taken for interest only. Here, then, is a case where an incorporation, created for the purpose of loaning money, and subject, like an individual, to the operation of the statute to prevent usury, have thought proper, deliberately, intentionally, and for years, to take over seven per cent, per annum. One would suppose, that the bare statement of facts would be a sufficient answer to all that has been, or can be said in justification of the practice adopted by the plaintiffs.
The statute of usury declares,(y) “ that no person or persons, whomsoever, shall hereafter take, directly or indirectly, for the loan of any moneys, &c., above the value of £7, for the forbearance of £100 for one year ; and so after that rate, for a greater or lesser sum, or for a longer or shorter time.” All notes, &c.; for the payment of any principal or *740 money lent, &c., are, by the same action declared utterly void. That the plaintiffs have taken more than at the rate of £7 in the hundred, for the loan, is proved by their own clerk, who was instructed, by the cashier of the institution, to receive it. It further appears, that they have taken interest in the same way for more than nine years. The statute declares the note void; and it would seem as though this Court had little else to do, except to permit the will of the legislature to have its effect.
I will, however, proceed to examine the grounds relied upon by the plaintiffs’ counsel, in justification of taking over seven per cent, per annum for interest. It is said that there is no corrupt agreement. In the first section of the statute, and which is the section declaring the notes, &c., void, nothing is said about a corrupt agreement. The words are, that “no person or persons whomsoever shall take directly or indirectly.” One would suppose, from the words used, that if a person should intentionally take for interestover seven per cent, the statute would be violated, and the security void. If it was taken through mistake, by which I mean a mistake of the fact, I should certainly not consider the statute violated. But if intentionally taken, the note is either void, or the statute for the prevention of usury is a dead letter. The will of the legislature is nothing. The idea of the necessity of our proving a corrupt agreement, which is so emphatically required of us, is derived from the English decisions, which are mere expositions of the statute of Henry the 8th. A short examination of the English statutes of usury, and a comparison of them with our own, will furnish a sufficent reason for declaring those decisions inapplicable here though I do not wish to be understood as admitting, that the manner of taking the interest, in this case, does not furnish what the Court will feel itself bound to consider as conclusive evidence of a corrupt agreement, if any such evidence were necessary.
The statute of Henry the 8th, which is the foundation of all the statutes against usury, and repealed all former acts, commences with these words: “ no person, by way of corrupt bargain, (fee., shall take, &c.” The statute of 21 Jac. 1, and 12 Car. 2, were passed with a view of reducing the rate of in *741 terest, leaving the statute of Henry the 8th, in all other respects, in full force. The statute of Anne reduces the rate to 5 per cent, and declares the contracts and securities for more void. These statutes being all in pari materia, are to be construed together; and, therefore, it is necessary, under the English statutes, that there should be a corrupt agreement.
Our statute says, “If any person shall take directly or indirectly,” without saying, by way of corrupt bargain, “ the security shall be void.” The English decisions on the statute of Henry the 8th, are therefore inapplicable, owing to the manifest difference of language used in the two statutes. It may be urged, that this construction includes the man who takes over 7 per cent, by mistake. I answer no; for the man who receives over 7 percent, not knowing that he does so receive, is not within the statute. The taking within the statute is an act of the will as well as the hand. It is not necessary that one should agree to give, and another tq take over 7 per cent, to make the security void. I put a case; suppose a person, about to discount a note, should calculate interest or discount at 8 per cent.-; the borrower not knowing the manner of calculating, but supposing that the interest was calculated at 7 per cent, takes the money, deducting this discount. Is not this usurious ? • Is not the security void, by the first section of the statute ? Would it be any answer to the defence of usury, that the borrower did not agree to pay the 8 per cent. ? that there was no corrupt agreement; and," therefore, that the security was not void, but good? Would it lie in the mouth of the lender to say to the borrower, “ True, sir, I took for the loan of my money over 7 per cent, but you did know it at the'time; therefore you did not agree to pay over 7 per cent, and, therefore, my security is good ?” This is, in substance, the language of those who would urge the necessity of our proving a corrupt agreement, for the purpose of making the security void. According to this, “if the borrower had known the fact, that that he was paying over 7 per cent, then the security would be void ; but because the lender had taken the excess in a secret manner, the transaction is not corrupt, and the secu *742 rity is good. But does not the borrower agree to pay the usury <i jje agrees to pay, and does pay the sum demanded for interest. Is not here, then, an agreement on the part of the borrower as well as the lender, provided any such agreement was necessary? If I am hot correct, the lender is permitted to say to the borrower, “ because the corruption is all on my side; because I have clandestinely taken from you over 7 per cent.; therefore I am- to be put in a better situation than I could have been, provided I had acted openly and fairly.” The plaintiffs appear - with an ill grace to allege the ignorance of the borrower. Whether he was ignorant that the plaintiffs were taking over 7 per cent, does not appear, and the plaintiffs "can never be permitted to make the allegation.
It has been said, that the bank did- not intend to violate the statute of usury, and, therefore, the security is not void. If a bank, or an individual, will adopt a mode of calculating interest by which they get over 7 per cent, they can never allege a want of intent, on their part, to violate the statute. If they will adopt a mod,e of calculating interest which is illegal, they must be responsible for the consequences ; for ignorance of law will excuse no man. The very adoption of such a mode is, in law and in fact, evidence, and that conclusive too, of an intention to violate the statute, as well as of a corrupt agreement.
I refer the Court to the Bank of Maine v. Butts,(z) for the purpose of showing what was there regarded as conclusive evidence of a corrupt agreement. The defence in that case, was usury; and the plaintffs put their right to take the sum which they bad received for interest, on the usage of banks. Sewall J. concludes his opinion in these words : “ It is probable, that in this case, there was no intentional deviation on the part of the bank, but a mistake of their right. This, however, is a consideration which must not influence our decision. The mistake Was not involuntary, as a miscalculation might be considered when an intention of conforming to the legal rule of interest, was proved, but a *743 voluntary departure from the rate. An excess of interest was intentionally taken, upon a mistaken supposition that banks were privileged, in this respect, to a certain extent. This was, therefore, in the sense of the law a corrupt agreement; for ignorance of law will not excuse.” It is difficult to imagine expressions more applicable to the case at bar. They are conclusive against the plaintiffs. It is difficult to conceive how the plaintiffs could be mistaken. Yet if mistaken, it was a mistake of the law, which can excuse no man. In the sense of the law, the taking, under such circumstances, was corrupt. The opinion in the case of the Bank of Maine v. Butts, was given upon solemn argument, by a Court of the first respectability, and although not binding as authority, is entitled, considering the eminent legal acquirements of the members composing that Court, to great consideration and respect. The amount in controversy was sufficient to induce that Court to consider well the grounds of their decision. The opinion of the Court, in that case, undoubtedly received the sanction of the then Chief Justice of that Court, who has justly been styled the Mansfield of America.
The maxim, ignorantia legis neminem ex cus at, is founded in the clearest reason, and the most evident necessity. Civil society could not, possibly exist without it. If ignorance could be alleged in justification, or in excuse for the violation of a law of general application, civil society would be at an end. This maxim is equally applicable to criminal as to civil jurisprudence. Blackstone says,(a) if a man thinks that he has a right to kill an excommunicated person, and does kill him, he is guilty of murder; for ignorance of law can never be alleged as an excuse, even in a criminal proceeding. The intention to kill was not more evident in the case put by Blackstone, than the intention, on the part of the bank, to take this interest. If the allegation of ignorance could not avail, in the case of murder, a fortiori, it ought not in the case of usury. The plaintiffs in this case intended to do every thing which the law makes necessary to constitute the offence of usuiy, and yet allege their innocence. They intended to get over 7 per cent, for interest on their loans, and then protect themselves by an allegation, *744 that they did not intend to be guilty of usury. If such pretences can avail them, the whole system of legal government is subverted.
Usury or not, say the plaintiffs’ counsel, is a question of intent. In this we agree. How is this intent to be ascertained ? Did the lender intend to take over 7 per cent, for interest ? is the inquiry, in all cases. If he did, then is there an end to the question of usury. This is a matter of fact, to be submitted to a jury, and if the jury find that the excess was taken for interest, the security is void. If they find that the excess can fairly be referred, in the transaction, to something else besides interest, then' the security is not void, because over 7per cent, has not been taken for interest. It is proved, in this case, that it was, and that, too, intentionally ; and the only question is, whether such an act is usury 1 This is a question of- law; or, in other words, what does the statute to prevent usury say a man may take for the forbearance of a loan of money ?
In Hammett v. Yea,(b) the question was, whether the transaction was usurious. The lender had gotten more than at the rate of 5 per cent, and whether the excess was to be called interest, or whether it could be fairly referred to something else, as remittance, was the question. The Chief Justice commences by saying, “ 1 will begin with stating my assent to the proposition, that when a party on a contract for a loan intentionally takes over 5 per cent, per annum for the forbearance of that loan, he is guilty of usury. But I add to this the further proposition, that whether more than 5 per cent, is intentionally taken upon any contract for such forbearance, is a mere question of fact for the consideration of the jury, and must always be collected from the whole transaction, as it passed between the parties.” If the jury had found that over 5 per cent, was intentionally taken for interest, then, according the opinion of Chief Justice Eyre, the transaction would have been usurious. Now the very fact which it was necessary there for the jury to find, is here proved by the clerk of the bank.
Will it be pretended, that the plaintiffs have not intentionally taken this $18 09, when it is proved that they have been in tire habit of taking interest in the same way, upon all *745 their discounts, since 1812; and when all the calculations have been made according to the directions of their cashier ? Will it be pretended, that any part of this $18 09 is referable to any thing else besides interest, when their clerk swears that it was taken for interest, and when, on the trial, they contended that they had a right to take this sum as interest ? Chief Justice Eyre goes on to say, “ If there be any over-plus after the 5 per cent, taken for discount, whether this overplus be referable to some lawful collateral consideration or not, is a question of fact for the jury.” In this case the Court considered the discounting of the bills, and the remittance of the’ money, as separate and distinct transactions ; that is, the 5 per cent, is paid the banker as discount, and the excess as a compensation for the remittance of the money to London j, and, therefore the transaction was not usurious.
Marsh v. Martindale.(c) In this case the jury found, that the plaintiffs' did°not intend'to be guilty of usury. Lord Alvanley, Ch. J. says, “ I stated to the jury, that if a man agree to take over 5 per cent, for the forbearance of money, the law declares such an agreement corrupt, within the meaning of the statute of Anne, whether the party thought, at the time, that he was taking usury or not. The finding of the jury does not prevent the Court from inquiring into the transaction, and declaring it corrupt, if it be so in point of fact.” In this case the Court, believing the transaction usurious, pronounced it so, contrary to the finding of the jury. According to the opinion in this case, it is of little consequence what the lender thought about the purity of the transaction, provided it is in law corrupt. All the authorities agree in this, that whether the lender intend to take over the legal rate of interest, is a question of fact for the jury. Yet if the jury should find contrary to law, declaring that not usurious .which in law is clearly so, the Court will set aside that finding.
The law, then, has fixed the intent with which a man acts, who takes over 7 per cent, for interest, deliberately and knowingly. ■ The case explains the manner in which the excess was obtained; by calling a year 360 days, and a month 30, in all their calculations. Shortening the time *746 raises the rate; and it would be as legal: for the plaintiffs to ma]£e a]] their calculations at 8 per cent; as to call less than 365 days a year. All commercial transactions prove the year to contain 365 days, and all banks, when they wish to protest a note payable one year after date, consider the year as containing 365 days. The statute of usury speaks of taking £7 for the forbearance of £100 for one year, and; so for a longer or shorter period. The legislature, when they regulated the rate of interest, had no reference to interest for months. The only true way of calculating is, to consider any number of days less than a year, as parts of a year, and take interest accordingly. A month, in the commercial transactions of this- country, contains either 28, 29, 30- or 31 days, and this inequality of days in a month clearly shows the impropriety of our calculating by months. Suppose a note payable one month after date, and dated 10th of February : according to the practice- of the Utica, bank,, they would get the interest for 33 days, when the borrower had the use of the money for 31 days only; there being 18 days in February and 13 in March, including the days of grace. In this way, the public are compelled to pay at the rate' of 7 per cent, per annum, when the money is loaned only for 336 days. Suppose a note payable six months after date, is discounted at the bank of Utica;. when is that note, according to the law of the land, to be protested for the purpose-of fixing the endorser ? on the 185th, 6th or 7th day; as the months; may be, including the days of grace ? If we consider 185 days as a part of 365, as by law I contend we are bound to do, the interest of $1000 for the time is $35-37. If the calculation is made- 30: days to a month, accordingto the practice of the plaintiffs, it amounts to- $35 98, and is made up by a-perfect contradiction of. the principle upon which they proceed, when they calculate time for the purpose of protesting this same note.
The plaintiffs, on the trial of this cause at the circuit, in justification of their practice; offered to prove the usage or - custom of banks. To the introduction of this evidence, the counsel for the-defendant objected; but: his honor the presiding Judge admitted the evidence subject to. the exception. This Gourfc are; therefore, called upon to say whether this *747 proof of usage or custom is legal, and whether sufficient was proved, and in a proper manner, to justify the plaintiffs.
This practice of the plaintiffs is either justified by the lex mercatoria, or custom of merchants, or by a usage which is proved by the clerk of the bank to have prevailed for 9-years among a certain set of men, and which this Court is now called upon to sanction.
What, then, is the lex mercatoria, and how is it to be proved 1 According to Blackstone,(d) it is a particular system of customs, used only among one set of the king’s subjects, “ which, however different from the rules of the common law, is yet ingrafted into it and made a part of it; being allowed for the benefit of trade, to be of the utmost importance in all commercial transactions. For it is. a maxim of law, that cuilibet in arte credendum est.” The law relating to bills of exchange, and all mercantile contracts, are as much the general law of the land, as the laws relating to marriage or murder. The lex mercatoria, or law merchant, is part of the common law of the land.
In one case,(e) the question was, whether a bill of exchange payable to order, becomes negotiable, and may be endorsed over, without the word order in the endorsement. On the trial at nisi prius, Lord Mansfield permitted the defendants to prove the usage of merchants in such a case. Witnesses were sworn on both sides. The jury found a verdict for the defendants. The plaintiffs moved for a new-trial, and alleged that the proof of usage of merchants ought not to have been received, because the law was already settled. Lord. Mansfield, in giving his opinion, on the motion for a new trial says, “ since the trial, I have looked into the cases and thought much about it, and am clearly of opinion, that I ought not to have admitted any evidence of the particular usage of merchants in such a case. Of this I say 1 am now satisfied, for the law is already settled.” He says further, “ the point now in question, has already been solemnly settled both in the King’s Bench and Common Pleas, by two adjudications; and, therefore, witnesses ought not to ■ have been called after such solemn determinations oí what the law was.” Dennison and Foster, Js. concurred, for the *748 reasons expressed by Lord Mansfield. Mr. Justice Wilmot sz¿^ u fae cust0m of merchants is part of the common law of England, and courts of law must take notice of it as such.” He further adds, “ if there be a doubt about the custom, it may be fit and proper to take the opinion of merchants thereupon ; yet that is only when the law remains doubtful.” “ Therefore,” he says, “ these judicial determinations of the point are the lex mercatoria, as to this question, for they settle what is the custom of merchants, which is the lex mercatoria, which is the law of the land. But this finding of the jury is directly contrary to the lex mercatoria, which is so fully settled and established by legal adjudications.” The law merchant is, therefore, a part of the common law, and in order to ascertain this law, we always resort to legal decisions.
If a question respecting the law merchant has once been established by judicial decisions, these are the only evidence which Courts receive of what the law is. Any other practice would be derogatory to Courts, by rendering the wavering and unstable opinions of individuals, of greater weight and authority than the solemn and deliberate opinions of judicial tribunals.
What, then, is the custom which the plaintiffs seek to establish? They say that they have always considered a month as 30 days, and a year as 360; and they say that they are justified in this by the usage or custom of banks. All judicial determinations, from the earliest cases, settle the law, as applicable to bills of exchange and promissory notes, that a year contains 365, and a month 28,29,30 or 31 days. The law on this subject is fully established by judicial determinations,- and, according to the opinion of Lord Mansfield, Edie v. The East India Company,(f) no proof of usage was admissible. Can it be pretended that a year is of one length when they wish to calculate interest, and of another and different when they wish to fix an endorser by protest? And is the same law merchant to bear them out in these two conflicting pretensions? This is the practice which the plaintiffs gravely ask the Court to sanction,' and entail upon posterity, in opposition to the known and estab *749 lished law of the land regulating time, and in the teeth too, of a statute of usury, which speaks a language too plain to he misunderstood, and whose provisions are too salutary to be disregarded.
Custom or usage may be proved for the purpose of showing that the excess, if any, was not taken for interest, but as a compensation for remittance, commissions, &c., not for the purpose of justifying the taking over the rate fixed by law. No usage can justify this,(g) any more than it could control an express contract.(h)
in the case of Dunham v. Gould (i) the Chancellor in giving the opinion of the Court, says, “ It is perfectly idle to talk of a custom of merchants to take a commission above the legal rate of interest, on the exchange of notes. Custom of merchants is not applicable to such a case.. It is not matter of trade and commerce within the law merchant, and if there were such a local usage in New York, it would be null and void, and could not be set up as a pretext or cover to trample down the law of the land. The money lenders throughout the country might as well set up a practice of their own, and then plead it in bar of the statute.” If the practice of the plaintiffs is adjudged good, then the practice of six or eight banks in this state will, in effect, be pleaded in bar of the statute. They will be permitted to trample down the law of the land. Lord Loughborough,(j) says, that the custom of trade to take over five per cent, (or the legal rate of interest of England) cannot authorize a greater demand than five per cent.
The language of Lord Mansfield, used in the case of Jestons v. Brooke,(k) when speaking of the case of Floyer v. Edwards,(l) will not warrant the idea that usage, be it ever so constant, would justify the taking of usury ; on the contrary, he expressly says it will not. The inquiry in the case of Floyer v. Edwards, was, whether the transaction was a borrowing and lending, and in this view the usage was taken into consideration.
In one case,(m) the defendant undertook to set up a custom in Southampton, that a pound should be 18 oz. The statutes of England having fixed the pound at 16, Lord Ken *750 yon says this custom cannot be supported. Among othertHiiigs, he says, “ as well might it be contended that a custom could prevail in a particular place, that a certain numher of days less than seven should constitute a week.” Rex v. Major,(n) was a conviction on the 23 Car. 2, for buying corn on the 23d July, 1791, at Newport,in-the Isle of Wight, different from the Winchester bushel. It appeared by the evidence set forth in the conviction, that the corn was bought by the customary measure used in the Isle of Wight, which contains a pint more than the Winchester measure. The defendent was convicted in the sum of 30s. and £10 15, the Value of the corn. The Court, notwithstanding this strong proof of usage-or custom, sustained the conviction. In this case, too, it appeared- that subsequent acts of parliament, requiring the return-of corn, had noticed the custom, and required the return according to such customary measure. It was contended that these subsequent acts had" repealed the statute, 22 Car; 2, and justified the custom. Lord Kenyon held otherwise, and said, “ we cannot get rid of these pósitive statutes.” In Rex v. Arnold,(o) the buyer in Huntington, was convicted of purchasing corn different from the Winchester measure. Lord Kenyon refers to this custom of farmers, which existed in many parts of the kingdom, and regrets that their obstinacy should have prevented the operation of the statute of Charles the 2d. The defendant was convicted, notwithstanding the proof of custom. These are strong and conclusive authorities to show that a custom however well proved, or however prevalent, cannot be set up in opposition to the law of the land.
In most countries, guards have been provided by law, against impositions upon community, in the use of false weights and" measures. This is highly penal in our own state,(p) and the offender, in public estimation, is justly consj:qereq jnfaIhous. Courts of justice have always been rigid in enforcing these statutes, inflicting punishment for the most trifling violation. Why was this ? The reason is obvious ; because weights and measures are of constant and daily use in our dealings with one another, and because the frequent use of the same false weight or measure would *751 enable its possessor to commit extensive injury upon his customers. That the variation is small, while it manifests a meaness in depravity, has a tendency to shield the offender from punishment. The injury becomes great by repetition. An extensivo merchant, by little and little, filches property from his customers, by the use of false weights and measures. What would Courts of Justice say to such a merchant, who, when indicted should, as the plaintiffs have done in this" case, plead the extensiveness of the practice. Would; they not say, that “ the law, and not the practice of others is to be your guide, and what you offer in justification shows, if true, the necessity of an immediate corrective.” For the purpose of showing what usages are good, and how far they are to operate when proved, and the manner of proving them, I refer the Court to the cases of Thomas v. Graves and Toomer,(q) Same v. O’Hara,(r) Cotton v. Johnson,(s) and Trott v. Wood.(t) Errors merely acquiesced in, do not constitute the law. In Leach v.Pargiter (u) the practice under the Lord’s act, had been one way for 30 years, but was altered the first time the statute came under the consideration of the Court.
In Butt v. Conant,(v) speaking of usage, Dallas, Ch. J. says, “ if the practice were against the first principles of constitutional law, and an evident* encroachment upon the rights of the subject, I would go even the length of saying, if it were of this discretion, and were sanctioned by the expressions of one of the Judges, in such a case I would not hold it to be law if it had" existed from the foundation of Rome.”
A custom contrary to public good, or injurious to a multitude and beneficial only to some particular persons, is repugnant to the- law of reason, and consequently void.(w) The Judges say, in things against law and reason, usage is to no purpose(x) Customs ought to be beneficial to all, , , , i , . ? . „ ’ but may be good when agamst the interests of particular persons, if for the public good.(y) A custom that begins by the extortion of lords of manors, is judged wanting a lawful beginning, and therefore void(z)
*752 The case of Rex v. Major(a) also shows that statutes passe¿ after the existence of the custom or usage is known, and in some measure sanctioning them, by authorizing re-turns according to the custom, do not affect a general law in relation to the same subject. If the legislature knew, at the time they incorporated the plaintiffs, that banks were in the habit of calling 360 days a year, when calculating interest, this case shows that such a circumstance will .furnish no argument for exempting them from the operation of a permanent and plain law of the land. In the language of Ld. Kenyon, they cannot get rid of the operation of such a positive law as the statute of usury. The convictions under the com laws, were upon penal statutes, where the utmost strictness is observed in construction, and the greatest latitude allowed in defence. They go to prove, beyond all controversy, that, on an iudictment, against a natural person, the facts shown in this case would ensure his conviction.'
The Court will find, if they examine the acts incorporating the different banks in this state, that most of them are restricted in their discounts, to six per cent, and those in the city of New York, which are not so restricted, usually confine themselves to that rate, otherwise they could not do business. Now a bank that takes at the rate of 6 per cent, may call any number of days, less than 365 a year, and calculate interest accordingly, provided they do not get over 7 per cent. The undoubtedly violate their charter, but are not guilty of usury.
It may be supposed, that the amount received was too trifling for the notice of a Court of Justice, and that judgment would therefore be given for the plaintiffs. I will not for a moment entertain the idea that such a supposition is correct. The statute of usury must be protected from the most trifling violations, or not at all. The legislature have set bounds to the unfeeling and avaricious lender, which he is not to pass with impunity; and that Court is guilty of treachery to the public, that does not confine him within legislative limits. The Judge would ill deserve a seat upon the bench of justice, who should let his decision be at all influenced by the amount which the violator of the statute *753 had received. If 26 cents can be received upon the statute with impunity, so can 26 dollars, and there is nothing to be done by a Court of Justice but rigidly to adhere to the rate fixed by statute. In the case of Rex v. Major,(b) the difference between the two measures was trifling, and yet 'J' " no one ever thought of urging that as an argument in favor of the defendant’s acquittal. 1 challenge gentlemen to point out a case where the amount received has ever been taken into consideration, for the purpose of deciding whether the transaction was usurious. If the amount exceeds the rate fixed by statute, it is usurious ; no matter how trifling the excess. The cases authorizing the taking of interest in advance, may be cited for this purpose. I was aware of the case of The Manhattan Company v. Osgood,(c) cited on the other side, and I am also aware that that decision is not supported by the authorities relied on. Yet if that case is introduced for the purpose of showing that the violations- of the plaintiffs are to be sanctioned, it proves too much; for we then have no statute of usury at all; and if this is the extent to which that decision is to lead, I trust this Court will pronounce it not law.
Something has been said, and more probably will be, in regard to the consequences of a decision against the plaintiffs. This is an argument seldom resorted to when other substantial grounds can be taken. It is generally the last, and with parties situated like the plaintiffs, the most desperate effort. Such arguments, however, can never assist any person in arriving at the truth. In the case of Waters v. Stewart,(d) Chief Justice Spencer, in giving his opinion in the Court of Errors, says, “ arguments ab inconvenienti have been suggested. There can scarcely exist a case, however well settled, where such arguments cannot be urged. They prove nothing, and should be listened to only in doubtful cases.” In the case of Langdon v. Potter and others,(e) Chief Justice Parsons says, “ arguments drawn from inconvenience, are to have weight only in doubtful cases.” In the present case nothing is doubtful.
Private statutes, made for the accommodation of particular citizens or corporations, ought not so to be construed as *754 to affect the rights or privileges of others, unless s.uch com stmction results from express words or necessary implication.(f)
It may he well, perhaps, since arguments ab inconvenienti have been used for the plaintiffs, to turn the attention of the Court, for a moment, to the consequences of a decision against .the defendant. The plaintiffs by calling 360 days a year, have, ever since their incorporation, made every 73d dollar of discount oyer 7 per cent. The .only true way of testing the operation .of any practice-is, by viewing its consequences for a long course of years, and for the purpose of showing this, I have made a calculation, giving its effect upon one million of dollars for a century. By this calculation it will appear, thatin a century, over twelve millions of dollars will be illegally taken. This makes an annual average of 120,000 dollars. The circulating medium of the United States is probably not far from 150,000,000. The amount of the annual ayerage which would be thus illegally taken, upon the principle .contended for by the plaintiffs from the whole United States, over .and above 7 per cent, would be 18.000,000. The inconsiderable sum which will probably be lost by a judgment against the plaintiffs, compared with the enormous tax which will certainly be entailed upon community by a contrary decision, sinks into utter insignificance. The amount which will be lost to the plaintiffs, will, in all prpbability, fall far short of xvhat they have illegally tqken; and it is of immense importance to a growing commercial country like ours, that questions of this sort should be settled upon true principles. If we were compelled to make pur loans from foreigners, upon the principles contended for by the plaintiff’s counsel, the effect would be utter destruction. In a very short time the whole wealth of the country would be exhausted by such illegal exactions. Compared with such a state of things, the paltry tax npon tea, which contributed to produce the revolution, would have been insignificant indeed. The restrictions against usury are founded on the strongest reasons of policy and morality; they have, therefore, been imposed in almost every age and country. It is no law of doubtful policy or ex *755 pediency which you are called upon by the defendant to enforce. It is a law which the greatest and the best of Judges have felt bound to watch with unceasing vigilance, guarding its provisions from the most trifling infractions, and enforcing its penalties fearless of consequences. It is a law which our very nature renders necessary, and which has been hallowed by the sanction of accumulated ages. It is not like some exploded edict of despotic power, preserved as a pretext for plunder and oppression. It is one of the few restraints which, in the most corrupt times, have always been placed, even by the very worst rulers, upon the rapacity of the worst part of community, for the protection of the poorest. It is prohibited by the common law, and the punishménts inflicted for its restraint have been rigorous and severe. It is laid down in the books as a sound rule of construction, and in some cases by legislative enactment, that the statute shall, in all cases, be construed most strongly against the usurer. Though the borrower was formerly considered a parficeps criminis, that idea is now justly exploded, considering that he is in the power of the lender, and necessarily submits to his terms. The desire of gain insensibly vitiates the heart. It was, therefore, wise for governments to erect a shield over the weaknesses, and a check upon the passions of men, to protect those oppressed with pecuniary embarrassments from the depredations of unfeeling avarice, and to guard weak and unfortunate individuals from the fangs of the Shylock. All privileged associations should be watched with Argus eyes. They should be regarded with distrust. It is the duty of Courts to keep them within the bounds prescribed by the legislature. They are opposed to the genius of our government, and if tolerated, should not be permitted to abuse the privileges with which they are entrusted.
These considerations apply with peculiar force to incorporated banks. Drawing around them, as they evidently do, a silent yet powerful influence in the neighborhood where they are situated, they will ever be watched with jealously by a people alive to their rights and liberties. Banks being granted for the express purpose of loaning mo *756 ney, the rule of construction of the statute of usury will not p,e softened in their favor. If the principle contended for by the opposite counsel be correct, what salutary statute can hereafter stand against the usages of trade 1 What law can hereafter be enacted, which may not be trodden down by the custom of banks.
D. Cady, in reply.
It is certainly well settled by the authorities cited in the opening, that to constitute usury, so as to avoid the security, there must be a corrupt agreement. No case has been produced to the contrary. If this be necessary, then, in order to constitute the offence with which we are charged, we must have had an associate. It is difficult to conceive how there can be a corrupt agreement, without there being two parties. These are essential to every contract. Who is the person with whom we have made the corrupt bargain charged upon us ? Not the defendant. He disavows it. It is denied that he knew any thing of the usury, till some time after the note in question was discounted ; and his counsel complain that he has been practised upon from the beginning, without knowing any thing of the imposition. All is a recent discovery.
Now I propose to show conclusively, that there never was a case of usury without the concurrence of two parties. Smith v. Beach,(g) is a respectable authority to this point, and will be found to accord as well with the spirit of all the cases, as with reason and common sense. The point there directly decided, was that a corrupt agreement, in which the minds of the parties meet, is necessary to constitute usury ; and, therefore, where more than lawful interest was reserved, with the knowledge of the lender, but without the knowledge of the borrower, it was held that the transaction was not usurious. The reasoning of the Court is directly applicable to this case, and, if it be law, is conclusive in favor of the plaintiffs. “ A corrupt agreement (they say) is essential to constitute usury; and, to form a corrupt agreement, as in all other contracts, the minds of the parties must meet. The assent of Beach (the defendant) was, therefore, as essential to the existence of an usurious agreement *757 as that of Bird, (the plaintiffs’ testator.) From these premises it follows, as an undeniable consequence, that there could be no corrupt agreement, while either of the parties remained ignorant of the excessive reservation; and the jury ought to have been so instructed.” It will be seen, by that case, that the Connecticut statute is the same, in substance as our own. The same arguments were urged as here, against the necessity of a corrupt agreement. It was said to be enough that the lender voluntarily made an usurious reservation ; and oí the fact that he did so there was no dispute : but the law was denied by the Court. • The ignorance of the borrower precluded the possibility of an agreement.
The several provisions in the 1st and 2d sections of the statute of usury,(h) show, that the distinction between the two cases, of a corrupt agreement and the receipt of excessive interest by the lender without the concurrence of the borrower, was intended to be kept up by the legislature. The 1st section provides for the case of taking excessive interest for the forbearance of money, or reserving it by certain contracts or securities. If so taken or reserved, the contract or security is declared void. The contract itself is vitiated by the corrupt agreement. The second section was intended to provide for taking usurious interest, in the same way, and it gives the remedy. Within one year the borrower may recover back the excess. If not knowingly paid, the statute could never have intended to confine him to the year. If ignorantly paid, he has the six years, and might recover it back, upon the general principle, that it was money paid through mistake or fraud. It stands on the same footing as money twice paid on a note by mistake. Suppose an illiterate man to borrow $100, and the lender fraudulently draws, and procures him to sign a note for $105. This would not be void for usury, but for fraud; whereas, if the lender should say, I must have $105, and the borrower then should sign a note for that sum, it would be void for usury. If gentlemen are willing to abide by their own admissions, the case is against them. They are loud in urging the entire ignorance of their client that any excess was de *758 manded; and, indeed, this is plain from the proof, if the con cesga3Q had not been made. The .defendant never thought of an .usurious .contract. It was made out by calculation . * *' and inference. The note is presented and the money re? cejved, silently, in the ordinary course of business, without dreaming of usury. Neither Maynard nor Spencer were authorized to part with the notes at an usurious rate of dispount. The circumstances under which the second note Was discounted are not' explained; but, as to the first and second, both parties agree that the defendant acted unwittingly. If th.e agent had sworn that he paid $40 excess, without knowing what he was about, it might have been recovered back within 6 years, in an action for money had and received, upon ¡general, principles, but the note would not b.e void -for usury.
The first counsel for the defendant conceded, that if the second note was valid, w.e may recover for that. If void, we may go for the first, if that he good. Upon the latter, it is said we took interest for three days, which it had already run when presented for discount; but was it not, to all legal purposes, discounted on' the 12th of September. It was car? ried for discount on that day, and on an objection being made to the form of the note, another was afterwards substituted in an acceptable shape, which was actually discounted upon the 15th. The money was, then, virtually set apart for this purpose upon the 12th, There was a proposition to do it, which was afterwards executed. Take the case of a request for a loan in the morning, and the money laid apart for the purpose, but not actually counted out till the next day, when the loan is completed : would it not be iniquitous to object usury 1 The Court are called upon to presume what the contract was ; for none of an usurious nature is shown; and they will not make a presumption which shall involve the party in guilt.
But what is the legal date of a note 1 It is the time of . deliyery.(i) This was on the 15th of April, when a discount for 90 days was rightly taken $ for it had that time to run. an actj0¡3 been prosecuted before the expiration of that time, it would not have lain. The Court would rather presume this to have been the contract, than impute the crime *759 of usury. Suppose the note had been ante-dated a year, by mistake, and the discount for a quarter taken. The Court would still say to the holder, “ your engagement was to wait the 90 days, for which you may take the discount; but cannot sue before the expiration of the time.”
It is said, that our miscalculation was intentional; but this is not necessarily so. Will the Court presume it ? The division of time is of human invention ; and there is no such absolute certainty and plainness in measuring, as to preclude mistake. We are told that the statute speaks of a year, or a longer or shorter time, and that quarters and months are not taken into account; but we are not informed what operation to adopt, in order to reach the law of less than a year. You divide 365 days by 12, if you are seeking for a month, and reject the fractions. This gives a quotient of 30, which multiplied by 3 gives 90 days, or a quarter of a year, if fractions are still to be disregarded. Upon this principle, on a 60 day’s loan, you get the interest for a year, and divide by 6.
But suppose 90 days are improperly called £ of a year: on looking at the calculation, the Court will see that the interest is calculated for 90 days, excluding the first or day of the date, which was also the day of the lending; so that, in truth, the only question is, whether the lender is entitled to interest on the day upon which he loans the money. Is it to be tolerated, that we are to forfeit our security for the whole sum, merely because we have charged interest for the first day? Will the Court say, that because the calculation happens to cover that day, that so small a mistake, even if it be one, shall overturn the whole demand ? But is it a mistake ? Every law book, speaking of time, tells us that fractions of a day are to be rejected. This is an established general rule, and only to be departed from when it becomes material to inquire beyond it, upon principles of necessity, or for the sake of equity. Are we to be stigmatized as usurers on such a ground as this ?
It was not our fault that we discounted the second note before the first had run out; though be this as it may, it could not change the character of the first note. But such a transaction is not usury, even if it is to be deemed a con *760 tmuation of the first. The party was under a necessity of obtaining a discount of his note thus early, in order to comply with the course of business which is universal at the banks throughout the commercial community. It was in reference to the discount days, which cannot be so regulated as to meet the views of individuals. Upon the question coming up in Brown v. Harraden,(j) whether 3 days of grace are to be allowed upon a promissory note, Ld. Kenyon gives great influence to the universal practice which prevailed on this subject. He says,(k) “ in addition to these considerations, we are now told that it has been the constant practice at the bank, and at the principal bankers, to make this allowance on promissory notes. Then, if we were to make a decision in opposition to all this practice, it would be attended with the most serious consequences ; for these notes are circulated not only throughout this country, but also over several other countries of Europe. Many of them have been discounted, and interest taken, on the supposition that 3 days of grace are allowed. But if we were to determine that no such allowance ought to have been made, all those parties would be involved in the crime of usury.”
This case goes, moreover, to show the weight which is given to arguments ab inconvenienti, upon these commercial questions. The consequences, to be deprecated are, the overthrow of floating paper, which has always been supposed to be good, and the involving thousands of innocent men, who never dreamed that they were taking excessive interest, in the crime of usury.
We accede the distinction made between mistakes of law and mistakes of fact. Knocking a man down in the street, or shooting at him, and taking his life, will constitute murder, whether the offender knows that it comes within the legal definition of this crime or not. But the two cases of Brown v. Harraden,(l) and Glassford v. Laing and others,(m) furnish a complete illustration of the distinction between a mere mistake of the law, and the one insisted upon in this case. We claimed the right to have the first day upon each note included. This is the mistake, if it can, bo calkiá one *761 We intended no more than 7 per cent, for the whole time; and the mistake of including the first day was one of fact merely.
■ Floyer v. Edwards,(n) was cited in order to show that the intention of the parties is material; that they must both concur in the bargain ; and the Maine Bank v. Butts,(o) with the same view. No mistake, in these cases, was pretended. There could be none. The latter was of notes palpably usurious. It was the case of taking two distinct notes for the same money. A note is taken, say for the principal, at three years : other notes are taken for a part of the same sum, at the same time, at shorter dates. This is the case of the Maine Bank v. Butts, yet the question of intention was left open to be referred to a jury ; and that question is always involved, where a party is on trial for a crime. There are certain offences to which knowledge is essential, and must be averred in an indictment. The crime of passing counterfeit money is one. Usury is another. The intention of the parties is here the git of the inquiry, and must always be left for the jury to pass upon. A man takes 8 per cent, ignorantly: unexplained, it would be usury. If shown to have been accident, it would be otherwise. Thus, even in 'the Maine Bank v. Butts, the act of taking the smaller notes was open to explanation, and the prima facie case, made out by the defendant, might have been done away, by proof on the other side.
It is complained, that our calculations were made in secret ; that the business was so managed that they could not be comprehended by the borrower. But what ought the Court to infer under all these circumstances 1 Here is plainly room for mistake. What should the presumption, be ? Glassford v. Laing and others,(p) and Buckley v. Guildbank,(q) are strong cases to show that where the Court can infer a mistake in taking the excess, they will do it, in order to avoid imputing the offence of usury. Taking a trifling excess beyond the legal interest, according to an extensive practice among money lenders, is a subject also of this rule of presumption in favor of innocence. “ Thus, Lord Mansfield, in Floyer v. Edwards :(r). “ Upon a nice calcula *762 tionit will be found, that the practice of the bank in'discount' £ng bills, exceeds the' iate of five peí cent, for they take interest for the whole time the bills run, but pay only part of the money, to wit, by' deducting the' interest first; yet this is not usury.” The Manhattan Company v. Osgood,(s) Was decided upon the same principle.
If gentlemen object to our rule of calculation, théy ought to have supplied us with a better.' The practice of calling 60 day's | of a year, in calculating interest, has prevailed for a great length of time ; and-, with a perfect knowledge Of this- practice, it will be seen- that almost- every act for incorporating banks refers- to 60 day nbtés. Being the most usual kind of bank paper, and understood in the long continued practice' of the commercial world to mean } Of a year, is it too much to say that the legislature referred to them in this character ? Indeed', they are, aS we have shown, in fact, f if you take them as the aliquot' part, and' reject the fraction.
It was not- usurious to discount the 2d and 3d notes before the ones for which' they Were substituted fell due. If there-had’ been a'n origna! express agreement to this effect, it would ha^e’been another question; btit the existence of any such-agreement is negatived by the proof
Sutherland, J.
The note on' which this suit was brought, bears date the 14th of March, 1821, and is payable in 90 days-after date. It wás presented at the bank, on the l’5th : $18 09', paid as the discoúnt- and interest upon it'. It fell dfie on the 15th June. The interest was calculated as in the case of the New York Firemen Insurance Company v. Ely & Parsons,(a) upon' the principle that 90 days Were the fourth of a year'. This note was the second' renewal of One, dated the 12th of September, 1820, and discounted by plaintiff at 90 days. The interest was calculated upon the same principle, and the- same amount received upon this and the second as upon the last-nóte.
It is unnecessary to consider the varioüs points' which were discussed in this'-casé; There ■ is' rtothin g fo take it Out of the operation of the' principle-established in The Firemen *763 Insurance Company v. Ely & Parsons ; that this mode of calculating the interest, renders the transaction usurious.
Woodworth, J. concurred.
Savage, Ch. J. To determine whether a contract is usurious, we must inquire,
1. Whether the subject of the contract is a loan ?
2. Whether more than lawful interest has been received or taken ? and
3. Whether it is the effect of a corrupt agreement ?
In this case, there is no dispute upon the first question. It is denied, however, by the plaintiffs, that they have taken more interest than they were entitled to receive.
The statute is very explicit, that no more than 7 pounds shall be taken for the loan of £100 for one year, and so after that rate for a greater or less sum, or for a longer or shorter time. The sum of $18 09, was received by the plaintiffs for the loan of $1000 for ninety-three days, and both the witnesses who have testified on that subject, have sworn that the interest on $1000 for that time, at 7 per cent, calculating 365 days to a year, amounts to $17 83 5. The fact is proved, then, that more than 7 per cent, has been received j and there is no pretence that it was taken by way of commissions or incidental charges. The custom, which is said to be universal, for all moneyed institutions, to calculate interest on 360 days as a year, can have no weight. It would be strange indeed, if the practice of any set of men, or companies of men, should become paramount to the authority of the legislature. With respect to most of these banks, who are said thus to calculate, it is well known that their loans are made at 6 per cent.; and although they receive more than six, yet the difference is not such as to amount to a violation of the statute against usury. Hence, perhaps, it is, that the custom hqs prevailed so generally. The excess amounts to a very little less than one tenth of 1 per cent. To an individual borrower, it is very trifling : to a bank, however, having an active capital of $500,000, this pittance will produce $500 per annum, and upon the whole active banking capital of the state, according to the the report of the Comptroller, it would produce $13,000. *764 The amount, therefore, is too large to be entirely disregard e(^ t,eCause de minimis non curat lex.
Again; it is alleged, that the plaintiffs have received interest for three days more than the true time included in the notes ; that is, they have received interest on $1000 for 279 days ; whereas the number of days from the 12th of September, 1820, to the 15th of June, 1821, reckoning one of these days inclusive, and the other exclusive, is 276 days only. So is the fact. The plaintiffs have, therefore, received the interest of those three days, at the rate of 14 per cent, per annum; for the second note was a renewal of the first, and the third a renewal of the second. Yet there is no evidence, showing that when either the first or second note was given, there was any stipulation for their renewal. The Clerk, who keeps the books of the bank, swears that each note was discounted on the day of its date; that on this being done, the proceeds were deposited to the credit of the person for whose use the discount was made ; and if he chooses to make a deposit several days before his note falls due, surely the bank ought not to be holden guilty of usury for receiving it, unless the transaction clearly appears to be a cover for usury, as in the Maine Bank v. Butts, (9 Mass. Rep. 49 to 55.) In that case, a loan was made of $10,000, payable part in 2 years, and part in 3 years. It appeared to be the practice of that bank, to take notes payable in 63 days ; and a week previous to the expiration of such notes, the borrower obtained a new loan of the same amount with which to meet the former. In that case it seems to have been part of the original contract, that the' borrowers of money from that bank should pay interest foi 70 days for every loan of 63 days ; and there was rea son to believe that the interest on the loan to Butts had been calculated on those principles, as the small notes given for the interest, greatly exceeded its lawful amount. It seems to have been supposed by the bank, also, that being authorized by their charter to transact business on banking principles, they were, thereby, exempt from the restrictions of the act to prevent usury. Judge Sewall, who gave the opinion of the Court, referring to the practice of renewing a *765 note several days before its expiration, observes, that, “ while each note sustains a discount or deduction at the established rate of interest only, there is no offence against the statute for the prevention of usury.” This doctrine must certainly be admitted, with the qualification, that these renewals must not be used as a cover for usury. In the case under consideration, the renewals appear to have been made as near as possible to the time when the previous note became due, having regard to the established days of discount at the bank. Had more than one discount day intervened between the discount of the second note and payment of the first, the transaction would certainly have carried suspicion, at least, upon its face.
The objection that interest was taken for several days between the date and the discount of the notes, or some of them, does not appear to be supported by the facts. The testimony is contradictory on the subject; but I think we ought rather to give preference to the Clerk of the bank who does not depend upon his memory, but upon entries made in the books of the bank at the time. In this respect we are performing the office of a jury, and ought not to be unnecessarily astute in detecting small unintentional errors, to defeat the recovery of a just demand. In making this remark, I mean not any reflection on the justice or policy of laws prohibiting usury. On the contrary, I believe such laws perfectly just and proper. They are necessary to protect the necessitous against their own acts of indiscretion. Nor would I impute moral guilt to those who receive more than the legal rate of interest, provided their exactions do not become oppressive. Usury is malum prohibitum— not malum in se. I am aware, that by some ancient English statutes, all usury was prohibited, as being against the law of God, the laws of the realm, and the law of nature. It was tolerated, however, by the law of Moses ; and allowed to be taken by Jews from the Gentiles; (Dent, xxiii. 20;) and, therefore, could not have been immoral in itself. The stat. 37 H. 8, c. 9, (A. D. 1546,) was the first statute of England, which permitted interest to be taken ; *766 and 10 per cent, was allowed. This statute was repealed -n jggj . p,ut revived by the 13 El-iz. c. 8, (A. D. 1570,) 10 per cent, was again the lawful interest; and by this act,contracts; assurances, &c. whereby above 10per cent, should he reserved, or taken for. money lent, are made void. In 1623, the rate of interest was reduced to 8 per cent.in 1660, to 6 per cent.; and in 1713, by the 12 Anne, c. 16, to 5 per cent.
. There is nothing in the objection, that interest was taken for the three days of grace ; for though the maker might have chosen to pay his note on the day when payable, yet the holder could not compel payment till after the expiration of the days of grace. To every practical purpose, therefore, the days of grace are part of the note itself.
’ Another objection (handed to the Court among the writ-: ten points, but upon which we refused to hear an argument) is, that it was usurious to take interest in advance without regard to the rules of rebate or discount.
Were the question upon this practice res integra, I should think it a palpable violation of the statute. The bank lends a man $1000 for a year, but actually advances him $930 only: the other" $70 they lend to somebody else, and deduct the interest "again.: But for the purpose of the present illustration, I will suppose the whole"$70 lent. At the end of the year, then, they receive from the first borrower their principal, $1000 ; from, these cound borrower, £74 90 ; making an excess of $490, beyond legal interest, which on a capital of $500,000; will produce $2450. On the other hand,, if the borrower puts his $930 out at interest, he will have at the end of the year, $995 10 only, with which to pay the $1-000 borrowed.. He therefore loses $4 90 ; which the• bank gains beyond the lawful interest; whereas if they were to retain the discount instead of the interest, the borrower would receive- $934 58; the interest of which is $65: 42, giving him his $1000 at the end of the year. The bank, by again lending the discount,. ($65 42) would receive, at the end of the year,.
,1. The whole: amount of. the loan, $1000 00
*767 2. The discount on $1000, 65 12
3. The interest on $65 42, 4 58
Making in all, . $1070 00
being the sum. loaned with 7 per cent, interest. Those banks who lend at 6 per cent, may safely adopt the practice of retaining the interest instead of the discount; sis the difference does not amount to quite half of 1 per cent.; they, therefore, do not violate the act to prevent usury.
Plain as this case appears to my mind, it has been solemnly adjudged not to be usurious, both by this Court, (The Manhattan Company v. Osgood, 15 John. 168,) and by the Supreme Court of the United States. (Fleckner v. Bank of the U. S. 8 Wheat. 838.) Both Courts found their decision upon the practice of bankers and commercial convenience. Judge Story, in giving the opinion of the Court, (8 Wheat. 354,) observes, that an authority to make discounts, means an authority to receive the interest iti advance. The same doctrine has been recognized in Pennsylvania (Pawling's Exrs. v. Pawling's Adms. 4 Yeates’ Rep. 220,223 ;) and in Massachusetts, (Maine Bank v. Butts, 9 Mass. Rep. 49.)
The point may, therefore, be considered settled until the legislature alter it, if they should think it proper or necessary ; but as the old ádjudications were different, it may be matter of curiosity, at least to trace its history. The oldest case which I have found where this doctrine was discussed, is Barnes v. Worlich, which is reported in Cro. Jac. 25; Moor, 644; Yelv. 30; Noy, 41; and 1 Bulstr. 20. These reporters disagree in some particulars; but they all concur in the point, that deducting the interest out of the loan, at the time when it was made, would be usurious, because the borrower would not have the use of the whole money for the year. The question before the Coiirt, was, whether a reservation, in the contract, of interest half yearly was usurious; and it was decided that it was not, though some of the Judges thought even that was usurious. This decision took place before the statute of Anne, and in the 43 or 44 Eliz. (about A. D. 1600.) The first case in which I have found a contrary dictum is Lloyd v. Williams, (2 *768 W. Bl. 792,) which was an action on the statute of usury for tjje penalty. The defendant had taken £6,5, by way of advance for £100; and to determine whether the action was brought in due time, the question before the Court was, whether the offence was complete on receiving the £6,5, or not till the final payment of the note. The Court decided that the offence was complete on receiving the £5,5 ; and Blackstone, Justice, said, “ that interest may as lawfully be received beforehand for forbearing, as after the term is expired for having forborne ; and it shall not be reckoned as merely a loan of the balance. Else every banker in London, who takes 5 per cent, for discounting bills, would be guilty of usury ; for if upon discounting a £100 note at 5 per cent, he should be construed to lend only £95. then, at the end of the time, he would receive £5 interest for the loan of £95 principal, which is above the legal rate.” This case is very fully reported in 3 Wils. 250 to 262, where the latter point is noticed by the Court, who declare that “ Worley's case," (S. C. as Barnes v. Worlich, in Cro. Jac. and other Reporters.) “ Moor, 644, shows that taking interest out of the principal, when it is first advanced and lent, is usurious, and contrary to the statute, and 1 Bulstr. 20, upon an information on the 13 Eliz. c. 8, for usury, S. P.” It appears that Blackstone, J. was not present when judgment was pronounced. The opinion was given by De Grey, Ch. Justice. This case was decided in 1771; and taking the two reports together, it appears that De Grey, Ch. Justice, and Blackstone, J. differed on the point now under consideration.
The case of Floyer v. Edwards, (Cowp. 112,) was next in point of time, being decided in 1774. That was an action for goods sold at 3 months credit, with an agreement that if the money was not then paid, the defendant should pay an half penny an ounce per month, till paid. This exceeded lawful interest; but was decided not to be usurious upon the usage of trade among gold refiners, to which the parties belonged; and Lord Mansfield observes, that, “ upon a nice calculation, it will be found that the practice • of the bank in discounting bills, exceeds the rate of 5 per cent, i for they take interest upon the whole sum: for the *769 whole time the bills run, but pay only part of the money, viz. by deducting the interest first; yet this is not usury.” The same point is adjudicated in 1787; (Auriol v. Thomas, 2 T. R. 52, & Winch, q. t. v. Fenn, n. (c) to that case;) and in several cases, subsequent to that time, in which, not only 5 per cent, interest was allowed to be deducted at the time of the loan; but also commissions and other charges, where the nature of the transaction is such as to render them proper. (1 B. & P. 143, and the cases there cited.)
This privilege of deducting the interest by way of discount, I apprehend, is confined to bankers, and those who deal in bills of exchange or promissory notes, by the way of trade. This is so, at least in England. In Marsh v. Martindale, (3 B. & P. 154,) the late plaintiff discounted a bill of exchange payable in 3 years, for £5000, and deducted the 3 years interest, £750. This was held to be usurious upon the authority of Barnes v. Worlich, and Dalton's case, (Noy, 171,) Lord Alvanley, Ch. J. justifies taking the interest in advance on bills of exchange, which he admits to be more than the legal rate, and adds, “In such cases, the additional sum seems to have been considered in the nature of a compensation for the trouble to which the lender is exposed.”
On the whole, therefore, I am of opinion, that the objections to the amount of interest, and the mode of transacting the business of the bank, are none of them tenable except the first, to wit, calculating upon 360 days as a year. This mistake cannot be called involuntary. There is no pretence of ignorance or inadvertence. It is a direct violation of the statute; and if Courts permit moneyed institutions thus to go on making one encroachment upon another, the statute against usury will soon become a dead letter.
That the receiving usurious interest intentionally, is sufficient evidence of a corrupt agreement, does not need an authority to support it.
In my opinion the defendant is entitled to judgment.
Judgment for the defendant.

 Domina Regina v. Dyer, 6 Mod. 41, per Holt, C. J Brough v Perkins, Id. 80, 81, per Holt, C. J.

 16 John 367.

 9 Mass. Rep. 49.

 Fisher v. Beasley Dongl. 235 Com. Dig Usury, (A.)

 1 R. L. 64, s. 10.

s) 9 Mass. Rep. 49.

 4 Bl. Com. 26.

 1 Bos & Pull. 151.

 3 B. & P. 153.

 1 Bl. Com. 75.

 Edie v The East India Company, 2 Burr. 1216.

 Id.

 Ord on Usury, 58, 59, 60, 61, Dunham v. Gould, 16 John. 367. Grisling v. Wood, Cro Eliz. 85.

 Yeats v. Pim, Holt's N. P. Rep. 95.

 16 John. 367.

 Ex parte Aynsworth, 4 Ves. 678.

 2 Cowp. 796.

 1 Id. 112.

 Noble v. Durrell et al. 3 T. R. 271.

 4 T. R. 750.

 5 T. R. 353.

 1 R. L. 376, 379, s. 12.

 1 Rep. Con. Court of S. C. 308.

 id. 303.

 3 Salk 110, 111.

 1 Gall Rep. 443.

 Doug.68

 1 Brod & Bing. 548

 Danvers 424, 427.

x) Plowd 170.

 Dyer, 60

 Plowd 332. Dyer, 199

 4 T. R. 750.

 Id.

 15 John. 162.

 Caines’ Cas. Err. 66.

 3 Mass Rep. 593.

 Coolidge v. Williams, 4 id. 145.

 3 Day’s Cas. 26.

 1 R. L. 64.

 Lansing v. Gaine & Ten Eyck, 2 John. Rep 300.

 4 T. R. 148.

 Id. 153.

 Id.

 l Campb. Rep. 149.

 Cowp. 112. Lofft, 596, S. C.

 9 MassRep. 49.

 1 Campb. N. P. Rep. 149

 Cro. Jac. f678.

 1 Cowp 115.

 15 John. 162.

 Ante, 678.